UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------X
SECURITIES AND EXCHANGE
COMMISSION,

                                  Plaintiff,          **MEMORANDUM & ORDER**

          -against-                                    05 CV 4643  (DRH) (GRB)

EHRENKRANTZ KING NUSSBAUM, INC.,
ANTHONY OTTIMO, and
BRENDAN E. MURRAY

                                  Defendants.
--------------------------------------------------------------X

**APPEARANCES:**

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
Attorney for Plaintiff
3475 Lenox Road, N.E.
Suite 1000
Atlanta, Georgia 30326
By:     Stephen E. Donahue, Esq.
        William P. Hicks, Esq. (*Pro Hac Vice*)
        Alana R. Black, Esq. (*Pro Hac Vice*)

**BRENDAN E. MURRAY, PRO SE**
72 Jayne Avenue
Patchogue, New York 11722

**HURLEY, Senior District Judge:**

On September 30, 2005, the Securities Exchange Commission ("SEC") commenced this

enforcement action against Ehrenkrantz King Nussbaum, Inc. ("EKN"), Anthony Ottimo

("Ottimo"), and Brendan E. Murray ("Murray") alleging that all three defendants violated Section

17(a) of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. § 77q(a); Section 10(b) of

the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b); and Rule 10b-5,

17 C.F.R. § 240.10b-5.  (Compl. ¶ 6.)  The SEC further alleged that EKN violated, and Ottimo

and Murray aided and abetted EKN's violation of: (a) Section 15(c)(1) of the Exchange Act, 15 U.S.C. § 78o(c)(1), and (b) Section 15(b)(7) of the Exchange Act, 15 U.S.C. § 78o(b)(7) as well as Rule 15b7-1, 17 C.F.R. § 240.15b7-1.  The crux of the allegations concern defendants' "scheme to defraud at least 9 mutual fund companies . . . for the purpose of enabling defendants' customers to place hundreds of 'market timing' orders in the funds without alerting the [funds] to their activities."  (*See* Compl. ¶ 1.)

On June 6, 2008, the SEC filed a motion seeking the dismissal of all claims against EKN and Ottimo with prejudice.[1]  By Order dated June 9, 2008, the Court granted the SEC's motion, and EKN and Ottimo were dismissed from the action.  Presently before the Court is the SEC's motion for summary judgment against Murray made pursuant to Federal Rule of Civil Procedure 56.  For the reasons set forth below, the motion is granted in part and denied in part.

## BACKGROUND

### Murray's Failure to Comply With Local Rule 56.1

The SEC's motion was originally filed on January 11, 2010.  The Court deferred ruling on that motion, however, based on its determination that the SEC failed to demonstrate its compliance with Local Rule 56.2 by serving Murray with a "Notice to Pro Se Litigant Opposing Motion for Summary Judgment."  (*See* Aug. 3, 2010 Mem. & Order at 5, 8.)  Moreover, Murray's opposition to the SEC's motion did not comply with the requirements of Rule 56 or Local Civil Rule 56.1.  Having found that the SEC had not provided Murray with actual notice of the requirements of Rule 56, the Court directed the SEC to re-serve its motion papers with a copy

---

[1]        According to the SEC, it accepted offers of settlement made by EKN and Ottimo that involved administrative relief.  (*See* SEC's June 6, 2008 Mot. at 2.)

of the Local Civil Rule 56.2 Notice upon Murray, and established a revised briefing schedule to permit Murray "another opportunity to submit an opposition to the SEC's motion for summary judgment that complies with the requirements of Rule 56." (*Id.* at 9.) Murray was specifically put on notice that his amended opposition papers had to comply with the requirements set forth in Rule 56 and Local Rule 56.1. (*Id.*) The SEC has demonstrated that it complied with the Court's August 3, 2010 Order by re-serving its moving papers and a proper Local Rule 56.2 Notice upon Murray. (*See* Aug. 16, 2010 Certif. of Service, Docket No. 70.)

Local Rule 56.1 of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York requires a party opposing a motion for summary judgment to submit "a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party, and if necessary, additional paragraphs containing a separate, short and concise statement of additional material facts as to which it is contended that there exists a genuine issue to be tried." Local Rule 56.1(b). This Court's Individual Practice Rules contain the additional requirement that "the papers opposing a motion for summary judgment shall reprint the movant's numbered paragraphs before providing a responsive paragraph." *See* Indiv. Practice Rule 3(k). Despite these requirements, and despite being served with a Local Rule 56.2 Notice, Murray has again failed to file a Local Rule 56.1 Statement. However, "[a] district court has broad discretion to determine whether to overlook a party's failure to comply with local court rules." *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 73 (2d Cir. 2001). Thus, while the Court could deem each of the SEC's factual statements admitted based upon Murray's failure to comply with this rule, *see* Local Rule 56.1(c), the Court will, in the exercise of its discretion, consider not only the uncontested facts set forth in the SEC's Local Rule 56.1

Statement, but also the "other facts contained in the record." *See Di Rienzo v. Metro. Transp. Auth.*, 237 Fed. Appx. 642, 646 (2d Cir. June 20, 2007); *see also In re Parikh*, 2009 WL 2383032, at *2 (E.D.N.Y. July 30, 2009) (collecting cases).

The following material facts, which are drawn from the Complaint and the parties' submissions, are undisputed unless otherwise noted.

*Market Timing*

The practice of market timing involves frequent, short-term buying, selling, and exchanging of mutual fund shares in order to take advantage of inefficiencies in mutual fund pricing. (*See* Compl. ¶ 2; Pl.'s 56.1 ¶ 4; Murray Dep. at 17.) The SEC acknowledges that market timing is not illegal, but asserts that such practice could "dilute the value of mutual fund shares and increase transaction costs" for a particular fund. (Compl. ¶ 2.) Additionally, the SEC asserts that "[s]ubstantial redemptions by a market timer may force a portfolio manager to liquidate certain fund holdings under unfavorable circumstances." (*Id.*)

*The Relationship Between EKN, Ottimo, and Murray*

EKN is a securities brokerage firm headquartered in Garden City, New York. (*Id.* ¶ 1; Pl.'s 56.1 ¶ 4.) Ottimo is EKN's Chief Executive Officer and a registered representative of the firm. (Compl. ¶ 1.) Between 2002 and 2004, Murray was the chief executive, sole owner, and only employee of White Star Capital ("White Star"), a corporation Murray formed for the purpose of "becom[ing] involved in the mutual fund industry." (Pl.'s 56.1 ¶ 2; Murray Dep. at 6; Murray's Opp'n ¶ 8.) Murray intended that White Star would serve as a "conduit for investment advisors engaged in market timing, to find venues for the execution and clearance of their mutual fund trades." (Murray Dep. at 7.)

4

At the end of 2002, Murray was introduced to Ottimo by an individual named Charles Sanacore. (*Id.* at 15.) During his deposition, Murray described Sanacore as someone who was "associated with [White Star] for a brief period of time in 2002," and "would facilitate the introduction of broker-dealers who would be willing to take on market timing business." (*Id.* at 6, 13.) As best the Court can determine from the record, at some point in early 2003, Sanacore became an employee of EKN. (*Id.* at 108.) Sanacore departed from EKN in July 2003. (*Id.* at 110.)

As a result of Sanacore's introduction, Murray and Ottimo entered into an agreement pursuant to which White Star provided "consulting services" to EKN, (Pl.'s 56.1 ¶¶ 4, 6; Murray's Opp'n ¶ 8; Pl.'s Ex. 118), which included locating professional investors and money managers who engaged in market timing, recruiting those investors to become clients of EKN, and then facilitating those investors' market timing once they became EKN clients. (Murray's Opp'n ¶ 8; Pl.'s 56.1 ¶ 4.) As compensation for these services, White Star received one-third of the "revenue streams" generated from the White Star-recruited investors-turned EKN clients. (Pl.'s Ex. 118.)[2] The relationship between White Star and EKN began in January 2003 and lasted through the end of that year. (Pl.'s 56.1 ¶ 6.)[3]

White Star provided EKN "back office support for the processing of mutual fund

---

[2]    Murray asserts that as of January 2003 (the effective date of the fee agreement between White Star and EKN), the remaining two-thirds of the "revenue streams" were divided between EKN and Sanacore. (Murray's Opp'n ¶ 8.) According to Murray, when Sanacore departed from EKN in July 2003, Murray's allocation of the "revenue streams" increased to 45%. (*Id.*; *see also* Murray Dep. at 110-11. )

[3]    During his deposition, Murray testified that White Star may have done "some residual business [for EKN] into the early part of 2004." (Murray Dep. at 9.)

transactions," which Murray defined as including: (1) "[a] knowledge of how mutual funds were processed in the industry," (2) facilitation of communication with EKN clients who were market timing, and (3) entering orders for those clients through EKN. (Pl.'s 56.1 ¶ 7; Murray Dep. at 14-15.) In 2003, Murray considered himself to be "an independent contractor" of EKN. (Murray Dep. at 108; Murray's Opp'n ¶ 8.) Murray was assigned a desk on EKN's trading floor of its Garden City office, an EKN telephone extension, and an email address within EKN's email system. (Pl.'s 56.1 ¶ 7; Murray's Opp'n ¶¶ 11, 12.)

The SEC asserts that "Murray dealt with primarily just Ottimo on all Murray's customer accounts." (Pl.'s 56.1 ¶ 8.) Murray contends that between January and July 2003 he reported directly to Sanacore, but then began reporting directly to Ottimo following Sanacore's departure in July 2003. (Murray's Opp'n ¶ 8.) In any event, Murray testified during his deposition that, at all times in 2003, either he or Sanacore "would update Mr. Ottimo as far as what was happening with the accounts." (Murray Dep. at 108.)

### *Mutual Fund Restrictions on Market Timing*

In 2002 and 2003, various mutual funds issued statements via their respective prospectuses indicating that "frequent trading might be disruptive to funds" and was, therefore, "frowned upon." (Pl.'s 56.1 ¶ 9.) Specifically, several mutual fund families limited the number of "exchanges" that a customer could make. (*Id.* ¶ 10.) An "exchange" is defined as a transaction moving money out of one fund and into another fund within a given mutual fund family. (*Id.*) For example, the AIM mutual fund family limited exchanges to ten per customer per year. (*Id.* ¶¶ 11-15; Pl.'s Ex. 234.) AIM's exchange policy was intended to limit each customer to ten exchanges; it did not condone the practice of a customer opening multiple

accounts to do ten exchanges per account. (Pl.'s 56.1 ¶ 14.) By promulgating this exchange limit policy, the AIM mutual fund family was attempting to prevent market timing and its attendant negative potential impact on shareholders, including higher administrative costs and lower returns. (*Id.* ¶ 13.)

Other mutual fund families espoused similar policies. The Invesco fund family had an exchange policy in place during 2003 that limited customers to four exchanges out of each fund per twelve-month period. (*Id.* ¶ 16; Pl.'s Ex. 207.) The Fidelity Investments fund family limited investors to four exchanges out of each fund per calendar year. (Pl.'s 56.1 ¶ 23; Pl.'s Ex. 267.) The Scudder Funds' prospectuses similarly reserved the right to limit any exchange where the shares had been held by the investor for less than fifteen days. (Pl.'s 56.1 ¶ 33.) Each of these policies was aimed at limiting and/or preventing investors from engaging in market timing. (Pl.'s 56.1 ¶¶ 25, 33-34.) When a mutual fund family detected a pattern of market timing, it would generally reject the trades and/or put a stop on the offending account so that no further trades could be made through that account. (*Id.* ¶¶ 15, 30, 38.)

Each of the above-mentioned mutual fund families dedicated some number of employees to the task of reviewing accounts and trading information in order to detect market timing activity. (*Id.* ¶¶ 17, 20, 27, 35.) For example, AIM had a market timing group comprised of two or three employees in 2003. (*Id.* ¶ 17.) Each day, this market timing group would receive a list of all exchanges involving $100,000 or more; this list usually had between 175 and 200 transactions per day. (Gunnar Dep. at 60-61.) The group would divvy up the list and review the trading history of each particular account to see if other exchanges had taken place on that account, and to determine whether the account had exceeded AIM's ten-exchange limit. (*Id.* at

61-62.) During 2003, AIM "kicked out" approximately $700 million in business when accounts were determined to have engaged in market timing. (*Id.* at 72.)

Each mutual fund family had difficulty detecting market timing when an investor opened more than one account and engaged in multiple exchanges per account. The mutual fund families generally had no method of linking account activity together, particularly when each account had separate account numbers, representative codes, or branch identifiers. (Pl.'s 56.1 ¶¶ 18, 20, 28, 29, 36-37.) For example, the "vast majority" of accounts within the Scudder family of funds were classified as "Level 3" accounts, for which Scudder did not have an individual account owner's name. (*Id.* ¶ 36.) Thus, an account held by an EKN customer would have shown up on Scudder's system only as an account of the entity that served as a clearing broker for EKN. (*Id.*) Scudder could see the representative code for each account, and did use that information in an attempt to identify patterns of market timing. (*Id.* ¶ 37.) A Scudder representative testified that it would have been more difficult for Scudder to identify a pattern of market timing in multiple accounts that were under common control of a single investor if different representative codes were used on each account. (*Id.*)

### The Alleged Account Cloning and "Mirror" Account Scheme

Murray, through White Star, introduced four clients to EKN and serviced their trading during 2003: Richard Lund, Dr. German Shapiro, Spectrum LLC, and Huntrise Capital Partners. (Pl.'s 56.1 ¶¶ 40, 94.) The SEC asserts that Murray engaged in a similar account cloning scheme with respect to each of these clients in an attempt to deceive various mutual fund families and allow his clients to engage in market timing that would have been rejected had it been detected by the mutual fund families.

8

### 1. *__Richard Lund__*

In 2002, Murray contacted Richard Lund, an individual who controlled a hedge fund by the name of International Equity Advisers d/b/a International Timing Fund, in an attempt to establish a business relationship between White Star and Lund.  (Pl.'s 56.1 ¶¶ 41, 43; Pl.'s Ex. 50.)  In a solicitation letter to Lund dated April 19, 2002, Murray noted the "tremendous bias" against market timing "within the mutual fund community," and pledged that White Star would "use [its] contacts to secure relationships with Investment Companies friendly to market timing investments."  (Pl.'s Ex. 50.)  Lund subsequently became a client of EKN, and Murray serviced Lund's accounts.  (Pl.'s 56.1 ¶ 43.)  At the beginning of their relationship, Murray explained to Lund that "by having White Star act on behalf of the market timer, we provide an additional level of shielding with respect to the name of a Market Timing Advisor being 'known' to a clearing broker and hassled about their trading activities."  (Pl.'s Ex. 51.)  During his deposition, Murray testified that he envisioned White Star serving as a "conduit" for Lund with the purpose of concealing Lund's identity so that he could engage in market timing.  (Murray Dep. at 25.)  This arrangement was acceptable to Lund, who had indicated to Murray that mutual fund families had previously stopped his market timing activity and that he "wanted the availability to trade as he saw fit."  (*Id.* at 27.)

Lund and EKN entered into a formal agreement on January 7, 2003.  (Pl.'s Ex. 54.) Subsequently, EKN set up at least three (and as many as nine) accounts for Lund and his hedge fund, International Equity Advisors ("IEA") under the names HabCo, First Cinco, and CoCinco. During his deposition, Murray described these account names as "three different operating entities" of Lund's business, and conceded that he "always believed them to be" simply nominee

names.  (Murray Dep. at 38-39.)

Murray's daily responsibilities in connection with servicing Lund's investments through EKN involved preparing a "recap of the prior day's trading activities," which he would then fax to Lund.  (Murray's Opp'n ¶ 20.)  Murray would wait to receive any trading instructions from Lund and then facilitated the requested transactions.  (*Id.*)  Specifically, Lund directed trades in each of his accounts by faxing orders to Murray or Ottimo who, in turn, provided those orders to one of the four traders who worked at the EKN trading desk.  (Pl.'s 56.1 ¶ 57.)  Murray was also responsible for "reviewing the prospectus of each fund to note what the fund's stated policy was on market timing."  (Murray's Opp'n ¶ 20; *see also* Pl.'s Ex. 54.)

During 2003, EKN processed its trades through a clearing broker, Correspondent Services Corp. ("CSC").  (Pl.'s 56.1 ¶ 58.)  CSC used a "Level 3" system to process some of its mutual fund trades, including certain of the trades ordered by Lund.  (*Id.*; Murray Dep. at 43.)  A Level 3 system electronically links the records of a broker-dealer (such as EKN) to the records of a particular fund's transfer agent.  (Pl.'s 56.1 ¶ 59.)  On the fund's end, the account number of a particular investor would identify only information about the broker-dealer, such as branch office location and representative code, and not information about the individual investor who actually controlled the account.  (*Id.* ¶¶ 56, 59.)  During his deposition, Murray testified that during 2003 he understood that if an EKN investor traded in a fund using two different accounts that had different branch office location and representative codes, the fund would not be able to use a Level 3 system to determine that the two accounts were both controlled by the same investor. (Murray Dep. at 46.)

In a January 14, 2003 written communication to Lund, Murray stated that "AIM limits

each *account* to 10 exchanges per year. . . . Following the 10th exchange in any given IEA

account, those assets allocated to AIM should be moved to a new EKN brokerage account, thus

resetting the 10 transaction counter." (Pl.'s Ex. 62-A (emphasis in the original).) In an email

dated January 17, 2003, Murray informed Lund that EKN could open "as many [additional

trading] accounts [with AIM] as wanted . . . This way when a fund closes HABCO out in

[existing account] I2-14664, you could then shift the capital allocated to that fund to the second

[newly-established] account and trade there until discovered there, and then move to the third

account, etc." (Pl.'s Ex. 74.) During his deposition, after being asked about this correspondence,

Murray testified: "The intent was to not draw attention to Richard Lund's trading activity in that

particular fund." (Murray Dep. at 57.)

By March 2003, certain mutual fund families were preventing Lund from market timing

in his existing accounts. (Pl.'s 56.1 ¶ 65.) On March 21, 2003, Murray sent Lund a

memorandum with the subject line: "Proposal for continued Timing Trading." (Pl.'s Ex. 75.)

The memorandum stated as follows:

> Given the number of funds that have restricted your accounts (I2-
> 14664, I2-14665, and I2-14666) from further trading, combined with
> the shrinking number of fund families that will permit some form of
> timing, we would like to propose that you consider shifting some of
> your investment capital to new, duplicate accounts.
>
> We have taken the liberty of opening three "mirror" accounts on our
> books. These accounts will be available for trading on Monday,
> March 24, 2003. In addition to the new numbers, we have assigned
> new representative codes to each account.

(*Id.*) The new accounts were assigned representative code "RC", which denoted an EKN

representative named Roseanna Cubelli. (Pl.'s 56.1 ¶ 66.) Although Cubelli's representative

code was assigned to these new accounts, she never functioned as a representative for those accounts. (*Id.* ¶ 67; Cubelli Dep. at 67.) In fact, Murray continued to service all of the new accounts for Lund and there was "no change in the operating procedure of how the accounts were handled on a daily basis." (Murray Dep. at 172.) Cubelli's code was used because the funds in question had identified the representative code on the existing accounts ("CS", which belonged to Ottimo) and were refusing to process further trades using Ottimo's representative code. (Pl.'s 56.1 ¶ 68.)

The term "mirror accounts" referred to newly-opened accounts with the same registration information (i.e., the same name, address, and tax identification number) as original accounts, but with different representative codes or branch location identifiers. (Pl.'s 56.1 ¶¶ 69, 70.) During his deposition, Murray testified that he understood that the use of mirror accounts would make it more difficult for mutual funds to associate two accounts controlled by the same investor. (*See* Murray Dep. at 63.) For example, during October 2003, a Fidelity fund detected that several accounts controlled by Lund were market timing and stopped trading activity on those accounts. (Pl.'s 56.1 ¶ 71.) At Murray's suggestion, the representative codes associated with Lund's accounts were changed in an attempt to pass the trades by Fidelity without detection. (*See* Murray Dep. at 69-70.) In addition, different branch location identifiers were listed on Lund's mirror accounts. During his deposition, Murray admitted that the purpose of using different branch identifiers was to make it more difficult for mutual funds to identify various accounts that were controlled by the same investor. (*See id.* at 72.)

The parties do not dispute that Murray did not personally open new mirror accounts for Lund, or for any other EKN customer. (Sur-Reply ¶ 5; Pl.'s 56.1 ¶ 67.) Rather, Cubelli opened

the mirror accounts at the direction of Murray and Ottimo. (Cubelli Dep. at 51, 61-62, 66-67.) Throughout 2003, Murray instructed Cubelli to open mirror accounts, with different representative codes and/or branch location identifiers from Lund's original accounts. (Murray Dep. at 72-77; Pl.'s Exs. 119-122.) The EKN employees whose representative codes were used on the Lund mirror accounts had no involvement with those accounts and often had no contemporaneous knowledge that their representative codes were used in connection with the Lund mirror accounts. (Cubelli Dep. at 67-71; Pl.'s 56.1 ¶ 77.) During his deposition, Murray admitted that during 2003, whenever Lund's trading in AIM funds was stopped for market timing, Murray (at the direction of Lund) would continue market timing in a separate mirror account. (Murray Dep. at 76-77.) Ultimately, Murray opened 33 accounts for Lund, using five different representative codes and four different branch location identifiers. (Pl.'s 56.1 ¶ 79.)

Despite the use of mirror accounts, mutual funds would occasionally identify a Lund account as engaging in market timing and would stop trading in the account. (*Id.* ¶¶ 80-87.) Murray testified that when this happened, he would suggest "establishing another account and journaling the customer's funds into another account so he could continue to trade in the manner he wanted to." (Murray Dep. at 98-99; *see also* Pl.'s Ex. 100.) During his deposition, Murray emphasized that he did not characterize any such communications with Lund as "recommendation[s]" because "Mr. Lund was fully conversant in this type of operating." (Murray Dep. at 101.) Throughout 2003, Murray "journal[ed]" Lund's money from stopped accounts to newly-created mirror accounts in order to permit Lund to continue market timing. (*Id.* at 100-106.)

## 2. *Dr. German Shapiro*

Murray met Shapiro, a personal investor whom Murray described as a "very sophisticated investor" that was "fully conversant in market timing," in early 2003. (*Id.* at 113-14.) Shapiro agreed to become an EKN client and opened at least ten accounts. (*Id.* at 113-14.) Shapiro's trading activity operating in a manner very similar to Lund's. (*Id.* at 114.) Shapiro was aware, from conversations with Murray and Sanacore, that the purpose of opening mirror accounts was to prevent mutual funds from associating newly-created accounts with any existing accounts that might have been stopped for market timing. (*Id.* at 114.) Shapiro's trading was stopped a number of times based on mutual funds' detection of market timing. (*Id.*; Pl.'s 56.1 ¶¶ 98-100; Pl.'s Exs. 176, 180.) When that happened, Murray advised Shapiro to "open a new IRA account with EKN (which would have a completely different account number) and roll over your assets from [the stopped account] into this new account. . . . In addition to providing a fresh account to trade the AIM funds, this move will also allow you to trade some of the funds we have been previously closed out of for timing." (Pl.'s Ex. 180.) Murray testified that mirror accounts, with different branch location identifiers and representative codes, were opened for Shapiro in 2003. (Murray Dep. at 130.) In all, approximately twenty-one accounts were opened for Shapiro, using at least eleven different representative codes and four different branch location identifiers. (Pl.'s 56.1 ¶ 101.)

## 3. *Huntrise Capital Partners, LLC*

Huntrise was a hedge fund that invested approximately three to four million dollars through EKN, and engaged in market timing. (Murray Dep. at 131-33.) Richard Gates was Murray's primary contact with Huntrise. (Pl.'s 56.1 ¶ 103.) Huntrise opened a number of

accounts at EKN and began to engage in market timing. When that activity was stopped by the mutual funds, additional mirror accounts (with different representative codes and branch location identifiers) were opened so that Huntrise could continue market timing without detection. (Murray Dep. at 135-37; *see also* Pl.'s 56.1 ¶¶ 110-13; Pl.'s Ex. 162.)

For example, on May 30, 2003, Murray emailed Gates to advise him that AIM had identified two Huntrise accounts as "'potential' market timers," and that Murray would open two "additional, new EKN accounts" so that Gates had the option to continue trading in the AIM fund family. (Pl.'s Ex. 168.) Murray opened these additional accounts, (Pl.'s 56.1 ¶ 115), and on August 26, 2003, Murray sent Gates a memorandum containing the following update regarding Huntrise's trading in AIM funds:

> Yesterday several buy orders were entered in accounts located in the "I2" branch identifier of EKN. These orders were placed under new representative numbers, with each account having a unique number.
>
> AIM has questioned these new representative numbers. This leads us to believe that AIM has focused upon the "I2" branch as a market timer. This could limit the ability to engage in future exchanges.
>
> . . .
>
> I will establish new sub accounts, and they will be available Tuesday. It may be possible to engage in one or two round trips in the current accounts, however that decision will be predicated upon your level of comfort given the possible heightened scrutiny AIM may be giving the I2 branch designator.

(Pl.'s Ex. 174.) Murray testified during his deposition that his plan was to open new accounts using different branch designators to give Huntrise "continue[d] access to AIM." (Murray Dep. at 165.) Overall, thirty-four accounts were opened for Huntrise, using at least sixteen different representative codes and four different branch location identifiers. (Pl.'s 56.1 ¶ 107.)

### 4. *Spectrum Capital LP*

Spectrum Capital was another of Murray's clients at EKN in 2003. Spectrum Capital is an investment fund that was engaged in trading and market timing. Murray's contact at Spectrum Capital was Yuri Sverdlov. (Pl.'s 56.1 ¶ 118; Murray Dep. at 168.) Murray testified that Spectrum engaged in the same strategy as Murray's other clients; multiple accounts were opened for Spectrum so that it could move funds out of any account that was restricted due to market timing and into a new mirror account to continue market timing. (Pl.'s 56.1 ¶ 119.) Spectrum had at least thirteen accounts that used five representative codes and four branch location identifiers. (*Id.* ¶ 119.) Sverdlov testified that he dealt only with Murray, and not with any of the other representatives whose codes were used on his account. (*Id.*) He further testified that he only used EKN's Garden City branch location and, therefore, there would have been no basis for using other branch location identifiers on his accounts. (*Id.*)

**Sample Volumes of Exchanges by Murray's Clients**

In 2003, Lund's EKN accounts, which were held under the names Habco, First Cinco, and CoCinco, made 121 exchanges in AIM funds and 94 exchanges in Invesco funds. (Pl.'s 56.1 ¶¶ 121-23.) Also during 2003, Huntrise used its accounts to make 121 exchanges in AIM funds, Spectrum used its accounts to make 240 exchanges at AIM, and Shapiro used his accounts to make 103 exchanges in AIM funds. (*Id.* ¶¶ 124-26.) Murray, through Whitestar, received $75,183 in compensation from EKN in 2003, and he received approximately $15,000 in residual compensation in 2004. (*Id.* ¶ 127; Pl.'s Ex. 143.)

***DISCUSSION***

## I.      *Legal Standard*

Summary judgment pursuant to Federal Rule of Civil Procedure 56 is only appropriate where admissible evidence in the form of affidavits, deposition transcripts, or other documentation demonstrates the absence of a genuine issue of material fact, and one party's entitlement to judgment as a matter of law.  *See Viola v. Philips Med. Sys. of N. Am.*, 42 F.3d 712, 716 (2d Cir. 1994).  The relevant governing law in each case determines which facts are material; "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  No genuinely triable factual issue exists when the moving party demonstrates, on the basis of the pleadings and submitted evidence, and after drawing all inferences and resolving all ambiguities in favor of the non-movant, that no rational jury could find in the non-movant's favor.  *Chertkova v. Conn. Gen. Life Ins. Co.*, 92 F.3d 81, 86 (2d Cir. 1996) (citing Fed. R. Civ. P. 56(c)).

To defeat a summary judgment motion properly supported by affidavits, depositions, or other documentation, the non-movant must offer similar materials setting forth specific facts that show that there *is* a genuine issue of material fact to be tried.  *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996).  The non-movant must present more than a "scintilla of evidence," *Del. & Hudson Ry. Co. v. Consol. Rail Corp.*, 902 F.2d 174, 178 (2d Cir. 1990) (quoting *Anderson*, 477 U.S. at 252), or "some metaphysical doubt as to the material facts," *Aslanidis v. U.S. Lines, Inc.*, 7 F.3d 1067, 1072 (2d Cir. 1993) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)), and cannot rely on the allegations in his or her pleadings,

conclusory statements, or on "mere assertions that affidavits supporting the motion are not credible." *Gottlieb v. Cnty. of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (internal citations omitted).

The district court, in considering a summary judgment motion, must also be "mindful . . . of the underlying standards and burdens of proof," *Pickett v. RTS Helicopter*, 128 F.3d 925, 928 (5th Cir. 1997) (citing *Anderson*, 477 U.S. at 252), because "the evidentiary burdens that the respective parties will bear at trial guide district courts in their determination of summary judgment motions." *Brady v. Town of Colchester*, 863 F.2d 205, 211 (2d Cir. 1988). Where the non-moving party will bear the ultimate burden of proof on an issue at trial, "the moving party's burden under Rule 56 will be satisfied if he can point to an absence of evidence to support an essential element of the" non-movant's claim. *Id.* at 210-11. Where a movant without the underlying burden of proof offers evidence that the non-movant has failed to establish her claim, the burden shifts to the non-movant to offer "persuasive evidence that [her] claim is not 'implausible.' " *Id.* (citing *Matsushita*, 475 U.S. at 587).

## II.     The SEC's Claims Based Upon Murray's Alleged Violations of the Anti-Fraud Provisions of the Securities Laws

The SEC alleges that Murray violated Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act, and Rule 10b-5 by "misrepresent[ing] and conceal[ing] [ ] the customers' identities and the common control of multiple accounts [ ] through the use of multiple account numbers with false rep codes and false branch identifiers." (Pl.'s Mem. at 22.)

Pursuant to Section 10(b) of the Exchange Act, no individual may:

> use or employ, in connection with the purchase or sale of a security
> . . . any manipulative or deceptive device or contrivance in

> contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe as necessary or appropriate in the public interest for the protection of investors.

15 U.S.C. § 78j(b). "Section 10(b) of the Exchange Act bars conduct involving manipulation or deception, . . . deception being misrepresentation, or nondisclosure intended to deceive." *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 161 (2d Cir. 2000). Rule 10b-5, which was promulgated by the SEC under the authority of Section 10(b), *see SEC v. Boock*, 2011 WL 3792819, at *21 (S.D.N.Y. Aug. 25, 2011), provides that:

> It shall be unlawful for any person . . . (a) To employ any device, scheme, or artifice to defraud, (b) To make any untrue statement of a material fact or to omit to state a material fact necessary to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

To make out a cause of action under Section 10(b) and Rule 10b-5, the SEC must show that Murray: "(1) made a material misrepresentation or a material omission as to which he had a duty to speak, or used a fraudulent device; (2) with scienter; (3) in connection with the purchase or sale of securities." *SEC v. Monarch Funding Corp.*, 192 F.3d 295, 308 (2d Cir. 1999). "The scienter needed in connection with securities fraud is intent to deceive, manipulate, or defraud, or knowing misconduct." *In re Carter-Wallace, Inc. Secs. Litig.*, 220 F.3d 36, 39 (2d Cir. 2000) (internal quotation marks omitted).

Section 17(a) of the Securities Act makes it unlawful for any person that sells securities "by the use of any means or instruments of transportation or communication in interstate

commerce or by use of the mails, directly or indirectly":

> (1) to employ any device, scheme, or artifice to defraud, or

> (2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which the were made, not misleading; or

> (3) to engage in any transportation, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

15 U.S.C. § 77q(a). To establish a violation of Section 17(a)(1), (2), and (3) of the Securities Act, the SEC must set forth "[e]ssentially the same elements" as are required under Section 10(b) of the Exchange Act, "though no showing of scienter is required for the SEC to obtain an injunction under [Sections 17] (a)(2) or (a)(3). *Monarch Funding Corp.*, 192 F.3d at 308. Moreover, "[t]he SEC does not need to provide investor reliance, loss causation, or damages in an action under Section 10(b)[,] Rule 10b-5, of Section 17(a)." *Boock*, 2011 WL 3792819 at *21 (citing *SEC v. Credit Bancorp, Ltd.*, 195 F. Supp. 2d 475, 490-91 (S.D.N.Y. 2002)) (first alteration added, second alteration in the original).

### A. *Material Misrepresentations or a Fraudulent Device*

As noted above, to establish the first element of its claim under the above-cited statutes, the SEC must demonstrate that Murray "made a material misrepresentation or a material omission as to which he had a duty to speak, or used a fraudulent device." *Monarch Funding Corp.*, 192 F.3d at 308. Here, the SEC has demonstrated that Murray made misrepresentations to the various mutual funds described above. The undisputed evidence on the record shows that when Murray's clients' market timing activity was stopped by the mutual funds, Murray created

(or directed the creation of) multiple mirror accounts with the sole purpose of allowing those clients to continue market timing without detection. Murray argues that there was nothing fraudulent about opening these accounts because "no false names or TINs were created." (Murray's Opp'n ¶ 23; *see also id.* ¶ 24 ("[A]ccounts opened at EKN were always done with the full, complete, and legal name of the client.") Murray does not dispute, however, that these mirror accounts were assigned representative codes for representatives that had no involvement with the accounts, and branch code identifiers that were completely inapplicable to the accounts. Murray insists that "[u]sing multiple accounts is not illegal." (Sur-Reply ¶ 11.) While that may be true, the "alleged fraudulent scheme is not the mere use of multiple accounts . . . ." *See SEC v. Pentagon Cap. Mgmt. PLC*, 612 F. Supp. 2d 241, 263 (S.D.N.Y. 2009). Rather, the SEC has demonstrated that Murray created these mirror accounts when his clients' market timing activity was detected and blocked by mutual funds; Murray's clients' assets were transferred from the original accounts to the mirror accounts so that their market timing could continue.

Murray's misrepresentations in this regard were material. The record evidence sufficiently demonstrates that the mutual fund families did not want investors to engage in market timing and sought to prohibit the practice by implementing exchange restrictions and by employing groups of analysts to detect and stop the practice. The undisputed evidence demonstrates that if the mutual funds had detected the market timing activity carried out by Murray's clients via their mirror accounts, they would have stopped it. This is sufficient to establish materiality. *See SEC v. Druffner*, 517 F. Supp. 2d 502, 508-09 (D.Mass. 2007).

Murray argues that he owed the mutual funds no duty to disclose that his clients were market timing. (Murray's Opp'n ¶ 33.) According to Murray, "what occurred at EKN was no

different than the customer who, seeing a sale of a product at a supermarket of a given item, say Pepsi Soda, with a limit, say 6 bottles per customer, who purchases the prescribed six bottles and exits the store. Later that day, or perhaps each day the sale is running, the customer returns to the store and, at each return visit buys an additional six bottles at the sale price. In such a case, how has Pepsi been harmed?" (*Id.* ¶ 5; *see also* Sur-Reply ¶ 17 (noting "there is no law, regulation, or customer that requires a card counter to identify themselves upon entering the Casino").)

Even if Murray correctly supposes that he had no affirmative duty to reveal that his clients were market timing, at least one district court has noted that a duty to disclose under Sections 10(b) or 17 or Rule 10b-5 can arise when "'a previous disclosure is or becomes inaccurate, incomplete or misleading.'" *SEC v. O'Meally*, 2008 WL 4090461, at *2 (S.D.N.Y. Sept. 3, 2008) (quoting *Burekovitch v. Hertz*, 2001 WL 984942, at *10 (E.D.N.Y. July 24, 2001)). In that case, the court refused to dismiss a complaint alleging facts similar to the ones in the present case, stating:

> [I]t is at least plausible that, after the mutual funds explicitly notified Defendants that the mutual funds no longer wanted Defendants to trade shares in their respective funds and actively sought to block Defendants' trading activities, there was a duty on the part of Defendants to disclose their identities should they choose to use different account names or FA numbers in the future. Failing to reveal their true identities would have rendered misleading their subsequent representations as to their identities and affiliations in connection with new trades.

*Id.* (citing *SEC v. Druffner*, 353 F. Supp. 2d 141, 148 (D.Mass. 2005) (finding duty to disclose adequately pled under similar factual scenario)).

In any event, even if Murray had no duty to disclose that the mirror accounts he opened were for clients whose trades had been previously stopped for market timing (and that those

mirror accounts had been opened for the express purpose of allowing those same clients to continue their market timing undetected), the SEC has successfully established the first element of its claims under the other applicable statutory definition – the use of a fraudulent device. The SEC has proffered undisputed evidence of Murray's "systematic use of multiple accounts . . . to conceal market timing trades from mutual funds." *See Pentagon Cap. Mgmt. PLC*, 612 F. Supp. 2d at 262.

Finally, Murray argues, and the SEC does not dispute, that it was Cubelli – rather than Murray – who technically opened the mirror accounts. The undisputed evidence in the record, however, demonstrates that Cubelli opened those accounts at the direction of Murray and Ottimo. (*See* Cubelli Dep. at 51, 61-62, 66-67.) Murray emphasizes that he "did not initiate the practice" of using mirror accounts (Murray's Opp'n ¶ 15), and that mirror accounts were used with the full knowledge and blessing of his superiors and senior EKN officers. (*See* Sur-Reply ¶¶ 5, 14.) However, Murray has failed to explain how other individuals' knowledge and approval of the use of mirror accounts as described above would absolve him of liability for his participation in the purported scheme. *See SEC v. Meltzer*, 440 F. Supp. 2d 179, 188 (E.D.N.Y. 2006) (finding that "'liability rests with any persons who meets the required elements, regardless of his role in the activity'") (quoting *Anixter v. Home-Stake Prod. Co.*, 77 F.3d 1215, 1224 (10th Cir. 1996)).

### B.    Scienter

"'Scienter, as used in connection with the securities fraud statutes, means intent to deceive, manipulate, or defraud, or at least knowing misconduct.'" *SEC v. Kelly*, 765 F. Supp. 2d 301, 319 (S.D.N.Y. 2011) (quoting *SEC v. First Jersey Secs., Inc.*, 101 F.3d 1450, 1467 (2d Cir. 1996)). The element of scienter "'can be satisfied by a strong showing of reckless disregard for

the truth.'" *SEC v. Tecumseh Holdings Corp.*, 765 F. Supp. 2d 340, 349 (S.D.N.Y. 2011) (quoting *S. Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 109 (2d Cir. 2009)). "Conduct is reckless if it represents an extreme departure from the standards of ordinary care to the extent the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Id.* at 349-50 (internal quotation marks omitted). "Furthermore, an egregious refusal to see the obvious, or to investigate the doubtful, may in some cases give rise to an inference of recklessness." *Meltzer*, 440 F. Supp. 2d at 189 (internal quotation marks omitted).

Here, the undisputed evidence demonstrates that the mutual fund families did not approve of market timing and actively sought to detect and stop it. Moreover, Murray was aware of the mutual funds' positions on this issue, as at least one of his clients required him to review the funds' respective prospectuses to keep abreast of their "stated polic[ies] [ ] on market timing." (Murray's Opp'n ¶ 20.)[4] Murray has admitted that when his clients' market timing activity was detected and stopped by mutual funds, he would open (or cause to be opened) new mirror accounts into which he would transfer his clients' assets from the stopped accounts. Murray does not dispute that the sole purpose of these mirror accounts was to allow his clients to continue market timing. This is clear not only from Murray's own deposition testimony, but from his numerous written communications with his clients, in which Murray informed them that their accounts had been stopped and then laid out his plan that would permit them to continue market timing. It is also undisputed that the mirror accounts were assigned inapplicable representative

---

[4]     The Court is not persuaded by Murray's implication that because the mutual funds assigned what Murray considers to be a small number of employees to monitor a large number of trades, the funds were not truly interested in preventing market timing. (*See, e.g.*, Murray's Opp'n ¶ 29(c).) The undisputed facts in the record demonstrate the mutual funds' desire, as publicly stated, to prohibit market timing.

codes and branch location identifiers with the sole purpose being to avoid detection by the mutual funds. Based on the record before this Court, Murray's intent to deceive the mutual funds is clear and undisputed.

Murray devotes much of his opposition papers to his insistence that "[m]arket timing was rife within the entire mutual fund community prior to 2003," (Murray's Opp'n ¶ 30), and, as such, Murray did not believe he was committing any wrongdoing. (*Id.* ¶¶ 27-36.) This argument is misplaced; the conduct at issue here is not the market timing itself, but the deceptive practices Murray engaged in to permit his clients to continue market timing without detection. *See Pentagon Cap. Mgmt. PLC*, 612 F. Supp. 2d at 263.

Accordingly, the SEC's motion for summary judgment as to its claims pursuant to Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act, and Rule 10b-5 is granted.

## III. The SEC's Claims Based Upon Murray's Alleged Aiding and Abetting EKN's Violation of Section 15(c)(1) of the Exchange Act

Section 15(c)(1) of the Exchange Act prohibits brokers and dealers from using "manipulative, deceptive, or other fraudulent device[s] or contrivance[s]" in connection with securities transactions. *See* 15 U.S.C. § 78o(c)(1)(A). The SEC asserts that "[t]hrough the violative conduct detailed [*supra*], EKN, as a broker-dealer, effected or induced transactions in securities through manipulative, deceptive or fraudulent devices or contrivances, in violation of Section 15(c)(1)," and that "Murray aided and abetted EKN's violations of Section 15(c)(1) . . . by knowingly carrying out the fraudulent acts." (Pl.'s Mem. at 22-23.)

The SEC can maintain its aiding and abetting claim against Murray by establishing: "(1)

the existence of a primary violation of the Exchange Act; (2) that the aider-abettor had knowledge of the primary violation; and (3) that the aider-abettor knowingly and substantially participated in the wrongdoing." *SEC v. Pasternak*, 561 F. Supp. 2d 459, 500 (D.N.J. 2008) (internal quotation marks omitted).

To establish EKN's primary violation of Section 15(c)(1), the SEC must set forth the same elements necessary to establish claims under Section 10(b) of the Exchange Act. *See SEC v. George*, 426 F.3d 786, 792 (6th Cir. 2005). The requisite scienter can be demonstrated with a showing "that a statement [was] 'made with knowledge or reasonable grounds to believe that it is untrue or misleading.'" *Id.* (quoting 17 C.F.R. § 240.15c1-2(b)). Here, the undisputed record evidence shows that Ottimo "approved Murray bringing in customers to market time and approved Murray 'facilitating' the market timing," (Pl.'s 56.1 ¶ 51), instructed Cubelli to open the mirror accounts and approved Murray's requests that Cubelli open mirror accounts, (*id.* ¶¶ 67, 76), had full knowledge that the mutual funds would have trouble detecting the market timing activity conducted via the mirror accounts, (*id.* ¶ 93), and knew that the purpose of the mirror accounts was to permit clients to continue market timing without detection by the mutual funds (*id.* ¶ 113). Thus, the SEC has established that EKN, through Ottimo, violated Section 15(c)(1) by virtue of its participation in the mirror account scheme.

With respect to the remaining elements of aider-abettor liability, the SEC has overwhelmingly established (as set forth above) that Murray had actual knowledge of the primary violation and that he provided "substantial assistance" in carrying out that violation. *See Pasternak*, 561 F. Supp. 2d at 502; *SEC v. Treadway*, 430 F. Supp. 2d 293, 339 (S.D.N.Y. 2006) ("The aider and abettor's substantial assistance must be a proximate cause of the primary

violation."). Thus, the SEC's motion for summary judgment as against Murray for aiding and abetting a violation of Section 15(c)(1) of the Exchange Act is granted.

### IV.     The SEC's Claims Based Upon Murray's Aiding and Abetting EKN's Violation of Section 15(b)(7) of the Exchange Act and Rule 15b7-1

Rule 15b7-1, which was promulgated pursuant to Section 15(b)(7) of the Exchange Act, 15 U.S.C. § 78o(b)(7), provides that:

> No registered broker or dealer shall effect any transaction in, or induce the purchase or sale of, any security unless any natural person associated with such broker or dealer who effects or is involved in effecting such transaction is registered or approved in accordance with the standards of training, experience, competence, and other qualification standards . . . established by the rules of any national securities exchange or national securities association of which such broker or dealer is a member or under the rules of the Municipal Securities Rulemaking Board . . . .

17 C.F.R. § 240.15b7-1. The SEC contends that Murray aided and abetted EKN's violations of these provisions. To successfully maintain aiding and abetting liability against Murray, the SEC must show: "(I) the existence of the technical violation by the primary party; (ii) knowledge of this violation on the part of defendant [ ]; and (iii) substantial assistance by defendant[ ] in the achievement of the violation." *SEC v. Cohmad Secs. Corp.*, 2010 WL 363844, at *6 (S.D.N.Y. Feb. 2, 2010) (citing *SEC v. DiBella*, 587 F.3d 553, 566 (2d Cir. 2009)).

Murray argues that the SEC has failed to establish EKN's primary violation of Section 15(b)(7) and Rule 15b7-1. The SEC asserts that "EKN effected transactions in securities at the same time that Murray – a person associated with EKN and who was involved in effecting securities transactions – was not registered with or approved by the NASD of which EKN is a member firm." (Pl.'s Mem. at 24-25.) The parties do not dispute that Murray was not registered

or approved with the NASD.  (*See* Sur-Reply ¶ 21.)  However, Murray appears to assert that he was not "associated" with EKN.  (*See* Murray's Opp'n ¶ 8 ("Defendant was not an employee, officer, manager, or registered representative of EKN."), ¶ 26 ("Defendant never had any managerial authority over any EKN employee, or had the capacity to direct the actions of any EKN employee regarding mutual fund trading or any other actions.").)  Murray also argues that he did not effect, and was not involved in effecting, transactions.  In particular, Murray claims that he was "compensated for his performance of nonregistered operations and processing services," and that his role at EKN "was limited to identifying the sub strata of funds that could be traded through EKN and its clearing broker, providing the intern symbols for those funds, preparing and faxing daily account activity reports and trade blotters, and related account documentation to clients."  (Murray's Opp'n ¶ 36.)

Assuming *arguendo* that the SEC could establish EKN's primary violation of Section 15(b)(7) and Rule 15b7-1, (i.e., that Murray was associated with EKN and that he effected transactions in securities even though he lacked the necessary registration), the Court finds that questions of fact exist as to the second element of the SEC's aiding and abetting claim, to wit: Murray's knowledge of any such primary violation.  Courts within this Circuit have made clear that a showing of the aider/abettor's actual knowledge of the primary violation, rather than recklessness or extreme recklessness, is required to sustain aiding and abetting liability.  *See SEC v. Apuzzo*, 758 F. Supp. 2d 136, 146-47 (D.Conn. 2010) (collecting cases); *SEC v. Stanard*, 2009 WL 196023, at *31 (S.D.N.Y. Jan. 27, 2009) ("Courts have been clear in requiring a showing of 'actual knowledge of the violation by the aider and abettor.'") (quoting *SEC v. Cedric Kushner Promotions, Inc.*, 417 F. Supp. 2d 326, 334 (S.D.N.Y. 2006)); *SEC v. KPMG LLP*, 412 F. Supp.

2d 349, 383 (S.D.N.Y. 2006) (finding that the relevant legislative history supports the conclusion that "Congress intended to allow the SEC to bring aiding and abetting actions only against violators with actual knowledge" of the primary violation).

The SEC does not directly address whether Murray had actual knowledge of EKN's primary violation. Murray asserts that he "reasonably believed that his role was akin to the service manager of a clearing broker/dealer," and that "[ha]ving been previously employed by different clearing broker/dealers, Defendant knew that those position did not required becoming a registered representative." (Murray's Opp'n ¶ 36; *see also* Sur-Reply ¶ 21 ("[Murray] did not seek registration and he was not compelled to become registered because his duties were not those of a registered representative.")). The SEC's only response is that "Murray's various functions are undisputed in the record" and that "they require registration." (Pl.'s Reply ¶ 21.) While actual knowledge may be demonstrated by way of circumstantial evidence, the SEC's case against Murray, as an aider and abettor, "may not rest on a bare inference that the defendant must have had knowledge of the facts." *Apuzzo*, 758 F. Supp. 2d at 147 (quoting *Woods v. Barnett Bank of Fort Lauderdale*, 765 F.2d 1004, 1009 (11th Cir. 1985)) (internal quotation marks omitted). The Court finds that Murray has proffered sufficient evidence to create a question for the jury as to whether he had actual knowledge of EKN's violation of Section 15(b)(7) and Rule 15b7-1. Accordingly, the SEC's motion for summary judgment as to Murray's aider and abettor liability under Section 15(b)(7) and Rule 15b7-1 is denied.

## V.    *Damages*

The SEC seeks permanent injunctive relief, disgorgement and pre-judgment interest, and the imposition of civil penalties against Murray. Parenthetically, it is noted that the injunctive

relief and disgorgement sought here are equitable remedies, which are appropriate for the Court –

rather than a jury – to impose.  *See SEC v. Castaldo*, 2009 WL 2591376, at *1 (S.D.N.Y. Aug.

19, 2009) (citing *Asron v. SEC*, 446 U.S. 680, 701 (1980)).  Moreover, it is the Court's function

to determine whether to impose civil penalties as provided by statute.  *See id.* (citing *Tull v.*

*United States*, 481 U.S. 412, 427 (1990)).  Under the circumstances, the Court will defer any

determination as to damages, injunctive relief, and disgorgement until the issue of Murray's

liability for aiding and abetting under Section 15(b)(7) of the Exchange Act and Rule 15b7-1 is

determined by a jury.

*CONCLUSION*

For the reasons set forth above, the SEC's motion for summary judgment is granted in part and denied in part. The SEC's motion is granted as to its claims that Murray violated Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act, and Rule 10b-5, as well as its claims that Murray aided and abetted EKN's violation of Section 15(c)(1) of the Exchange Act. The SEC's motion is denied as to its claim that Murray aided and abetted EKN's violation of Section 15(b)(7) of the Exchange Act and Rule 15b7-1. The Court's calculation of damages and determination as to disgorgement and injunctive relief are deferred pending the resolution of Murray's liability as to these last claimed violations. The parties are directed to confer and contact the Court within thirty (30) days to schedule a date for a Final Pretrial Conference. Counsel for the SEC is directed to serve pro se defendant Murray with a copy of this Memorandum & Order.

**SO ORDERED.**

Dated:    Central Islip, New York
          March 15, 2012

                                        /s/
                                   Denis R. Hurley
                                   United States District Judge