FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.
★ MAR 0 6 2013 ★
BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------x
SECURITIES AND EXCHANGE
COMMISSION,

                        Plaintiff,

              v.

BRENDAN MURRAY,

                        Defendant.
------------------------------------------------------------x

**MEMORANDUM & ORDER**
05-CV-4643 (MKB)

MARGO K. BRODIE, United States District Judge:

On September 30, 2005, Plaintiff Securities and Exchange Commission ("SEC") commenced this enforcement action against Defendant Brendan Murray.[1] On March 15, 2012, Judge Denis R. Hurley[2] granted Plaintiff's motion for summary judgment as to its claims that Defendant violated Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act and Rule 10b-5, as well as its claims that Defendant aided and abetted Ehrenkrantz King Nussbaum, Inc. ("EKN") in violating Section 15(c)(1) of the Exchange Act. Judge Hurley denied Plaintiff's motion for summary judgment with regard to Count Seven, which alleged that Defendant aided and abetted EKN in violating Section 15(b)(7) of the Exchange Act and Rule 15b7-1. Judge Hurley deferred ruling on damages until after a determination of Defendant's liability on Count Seven. Plaintiff then moved to dismiss Count Seven with prejudice. The Court granted Plaintiff's motion over Defendant's objection and referred Plaintiff's motion for damages to Magistrate Judge Gary R. Brown for a report and recommendation. On February 14, 2013,

---

[1] Ehrenkrantz King Nussbaum, Inc. ("EKN") and Anthony Ottimo were also named as defendants in the Complaint, but Plaintiff's claims against EKN and Ottimo were dismissed on June 9, 2008 pursuant to a settlement.

[2] This action was transferred to the undersigned on March 26, 2012.

Magistrate Judge Brown issued a report and recommendation (the "Report & Recommendation"), recommending a permanent injunction, disgorgement in the amount of $90,183 and civil penalties in the amount of $90,183. Defendant timely filed objections. For the reasons set forth below, the Report & Recommendation is adopted in its entirety.

I. Discussion

The Court assumes familiarity with the background of this case, which is set forth in detail in Judge Hurley's 2012 decision. *See SEC v. Ehrenkrantz King Nussbaum*, No. 05 Civ. 4643, 2012 WL 893917 (E.D.N.Y. Mar. 15, 2012).

a. Standard of Review

A district court reviewing a magistrate judge's recommended ruling "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C). When a party submits a timely objection to a report and recommendation, the district court reviews the parts of the report and recommendation to which the party objected under a *de novo* standard of review. *Id.*; *see also Larocco v. Jackson*, No. 10 Civ. 1651, 2010 WL 5068006, at *2 (E.D.N.Y. Dec. 6, 2010). The district court may adopt those portions of the recommended ruling to which no timely objections have been made, provided no clear error is apparent from the face of the record. 28 U.S.C. § 636(b)(1)(C); *see also Larocco*, 2010 WL 5068006, at *2.

b. Objections to the Report & Recommendation

Defendant objects to Magistrate Judge Brown's recommendation of disgorgement and civil penalties in the amount of $90,183 each.[3] (Def. Obj. 4–5.)

---

[3] Defendant did not raise any specific objections to Magistrate Judge Brown's recommendation of a permanent injunction. The Court has reviewed this portion of the report and recommendation and, finding no clear error, adopts the recommendation of a permanent

2

### i. Disgorgement

"Once the district court has found federal securities law violations, it has broad equitable power to fashion appropriate remedies, including ordering that culpable defendants disgorge their profits." *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1474 (2d Cir. 1996). The district court has "broad discretion" in both determining whether or not to order disgorgement and in calculating the appropriate amount to be disgorged. *Id.* at 1474–75; *see also SEC v. Rosenthal*, 426 F. App'x 1, 3 (2d Cir. 2011). "The primary purpose of disgorgement . . . is to deprive violators of their ill-gotten gains, thereby effectuating the deterrence objectives of those laws." *First Jersey Sec.*, 101 F.3d at 1474. Therefore, "the amount of disgorgement, as an equitable remedy, is determined by the amount of profit realized by the defendant." *SEC v. AbsoluteFuture.com*, 393 F.3d 94, 96 (2d Cir. 2004). Any uncertainty in the disgorgement calculation is resolved against the wrongdoer. *See SEC v. Milligan*, 436 F. App'x 1, 3 (2d Cir. 2011) (noting that any "risk of uncertainty in calculating disgorgement should fall on the wrongdoer whose illegal conduct created that uncertainty" (quoting *SEC v. Patel*, 61 F.3d 137, 140 (2d Cir. 1995))).

Magistrate Judge Brown recommended disgorgement in the amount of $90,183. (Report & Recommendation 7–8.) Defendant argues that disgorgement in an amount equal to the profits of White Star Capital ("White Star") is "flawed and unjust."[4] (Def. Obj. 5.) Judge Hurley found in his 2012 decision that:

---

injunction. *See Larocco v. Jackson*, No. 10 Civ. 1651, 2010 WL 5068006, at *2 (E.D.N.Y. Dec. 6, 2010) ("The court reviews unobjected-to portions of the R & R for clear error.").

[4] Defendant also argues that the Court cannot impose any damages because "[t]he assignment of damages requires a finding of fault." (Def. Obj. 4.) Defendant maintains that he did not violate any securities laws and, if he were permitted to go to trial, he would be exonerated. *Id.* Judge Hurley found that Defendant committed numerous violations of the

> Between 2002 and 2004, Murray was the chief executive, sole owner, and only employee of White Star Capital ("White Star"), a corporation Murray formed for the purpose of "becom[ing] involved in the mutual fund industry." (Pl.'s 56.1 ¶ 2; Murray Dep. at 6; Murray's Opp'n ¶ 8.) Murray intended that White Star would serve as a "conduit for investment advisors engaged in market timing, to find venues for the execution and clearance of their mutual fund trades." (Murray Dep. at 7.)

*Ehrenkrantz King Nussbaum*, 2012 WL 893917, at *2. Moreover, Judge Hurley found that "Murray, through Whitestar, received $75,183 in compensation from EKN in 2003, and he received approximately $15,000 in residual compensation in 2004." *Id.* at *8. Based on the foregoing, Magistrate Judge Brown found that White Star could be treated as an alter ego of Defendant for disgorgement purposes. (Report & Recommendation 7.) This Court agrees.

The purpose of disgorgement is to "deprive wrongdoers of the gains resulting from their illicit conduct and to deter others from engaging in similar unlawful actions." *SEC v. Milligan*, No. 99 Civ. 7357, 2009 WL 1162633, at *1 (E.D.N.Y. Apr. 29, 2009), *aff'd*, 436 F. App'x 1 (2d Cir. 2011) (citing *SEC v. Texas Gulf Sulphur Co.*, 446 F.2d 1301, 1308 (2d Cir. 1971)); *see also FTC v. Bronson Partners, LLC*, 654 F.3d 359, 372 (2d Cir. 2011) (noting that disgorgement is "a method of forcing a defendant to give up the amount by which he was unjustly enriched." (quoting *SEC v. Commonwealth Chem. Sec., Inc.*, 574 F.2d 90, 102 (2d Cir. 1978))). "The relevant inquiry is, thus, whether the defendant was unjustly enriched by his illegal conduct." *SEC v. Razmilovic*, 822 F. Supp. 2d 234, 252 (E.D.N.Y. 2011) (citing *SEC v. DiBella*, 587 F.3d 553, 572 (2d Cir. 2009)). Defendant argues that Plaintiff was obligated to seek disgorgement directly from White Star, and, having failed to bring an action against White Star, Plaintiff has

---

securities laws. *Ehrenkrantz King Nussbaum*, 2012 WL 893917, at *10–13. Defendant's alleged innocence is not a basis for rejecting the Report & Recommendation. Rather, Defendant's insistence that he did not do anything wrong is further evidence of the necessity of civil penalties. *See SEC v. Razmilovic*, 822 F. Supp. 2d 234, 280 (E.D.N.Y. 2011) (finding the imposition of civil penalties appropriate where the defendant "continues to refuse to admit any wrongdoing . . . and has never expressed any remorse for his conduct").

waived any right to recover White Star's profits and cannot now recover those profits directly from Defendant. (Def. Obj. 7–8.) As an initial matter, the Second Circuit has held that disgorgement of profits is permissible "against a person who is not accused of wrongdoing in a securities enforcement," where that person "has received ill-gotten funds" and "does not have a legitimate claim to those funds." *SEC v. Cavanagh*, 155 F.3d 129, 136 (2d Cir. 1998). Accordingly, failure to bring a proceeding against White Star does not preclude Plaintiff from recovering White Star's ill-gotten gains.

Moreover, Judge Hurley found that Defendant, the sole owner and employee of White Star, used White Star as a "conduit" for his illegal scheme. *Ehrenkrantz King Nussbaum*, 2012 WL 893917, at *2. Where, as here, a defendant uses an entity as the vehicle for his or her fraud, the court may use that entity's profits as a measure of the appropriate disgorgement. *SEC v. Pentagon Capital Mgmt. PLC*, 844 F. Supp. 2d 377, 427 (S.D.N.Y. 2012) (where the defendants illegal actions were taken through a separate entity, "disgorgement of the sum of all profits Defendants accrued through [that entity] is the appropriate measure of Defendants' illegal profits"). The undisputed facts establish that Defendant received, through White Star, $90,183 in ill-gotten gains. Accordingly, disgorgement in the amount of $90,183 is appropriate.

### ii. Civil Penalties

Section 20(d) of the Securities Act and Section 21(d) of the Exchange Act authorize the imposition of civil monetary penalties. *SEC v. E. Delta Res. Corp.*, No. 10 Civ. 310, 2012 WL 3903478, at *8 (E.D.N.Y. Aug. 31, 2012); *see also Pentagon Capital Mgmt.*, 2012 WL 1036087, at *2 ("Under Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), and Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3), courts must determine the civil penalty to be imposed 'in light of the facts and circumstances' of the case"). The maximum penalty is the "greater of the

figure reached under either the statutes' per-violation or gross pecuniary gain prongs." *Pentagon Capital Mgmt.*, 2012 WL 1036087, at *2. "Under the per-violation prong, the penalty is calculated by multiplying the number of violations by a dollar amount provided by statute." *Id.* Section 20(d) establishes three tiers of penalties: the first-tier penalty allows up to $6,500 per violation for any securities violation; the second-tier penalty allows up to $60,000 per violation if the violation "involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement;" and the third-tier penalty allows up to $120,000 per violation if the violation, in addition to the second tier factors, "directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons." 15 U.S.C § 77t(d)(2); 17 C.F.R. § 201.1002. The court may impose a penalty based on each of the defendant's violations. *See E. Delta Res. Corp.*, 2012 WL 3903478, at *9; *Pentagon Capital Mgmt.*, 2012 WL 1036087, at *2.

The tier determines the maximum penalty, but the "actual amount of the penalty [is] left up to the discretion of the district court." *SEC v. Kern*, 425 F.3d 143, 153 (2d Cir. 2005). The civil penalties serve a dual purpose — "to both punish the individual violator for his past violations and deter future violations of the securities laws." *Razmilovic*, 822 F. Supp. 2d at 280. In determining the appropriate civil penalty, courts consider the following factors:

> (1) the egregiousness of the defendant's conduct; (2) the degree of the defendant's scienter; (3) whether the defendant's conduct created substantial losses or the risk of substantial losses to other persons; (4) whether the defendant's conduct was isolated or recurrent; and (5) whether the penalty should be reduced due to the defendant's demonstrated current and future financial condition.

*Pentagon Capital Mgmt.*, 2012 WL 1036087, at *2 (quoting *SEC v. Haligiannis*, 470 F. Supp. 2d 373, 386 (S.D.N.Y. 2007)). In addition, courts look at whether the defendant has admitted any wrongdoing. *Razmilovic*, 822 F. Supp. 2d at 280; *SEC v. One Wall St., Inc.*, No. 06 Civ.

4217, 2008 WL 5082294, at *9 (E.D.N.Y. Nov. 26, 2008). Although these factors provide guidance, "the civil penalty framework is of a 'discretionary nature' and each case 'has its own particular facts and circumstances which determine the appropriate penalty to be imposed.'" *SEC v. Opulentica, LLC*, 479 F. Supp. 2d 319, 331 (S.D.N.Y. 2007) (quoting *SEC v. Moran*, 944 F. Supp. 286, 296–97 (S.D.N.Y. 1996)).

Judge Hurley found that Defendant had committed four securities violations, and, therefore, Plaintiff argues that the Court could impose four second-tier penalties for a total of $240,000. (Docket No. 84, Pl. Damages Mem. 16.) However, Plaintiff only seeks civil penalties for two second-tier violations in the amount of $120,000. *Id.* at 16–17. Magistrate Judge Brown did not address the maximum penalty permitted under the statute and, instead, focused on the five factors that guide the court's exercise of its discretion in imposing civil penalties. (Report & Recommendation 10–13.) Magistrate Judge Brown found that the first four factors weighed in favor of the imposition of civil penalties. *Id.* at 10–12. First, Defendant's multifaceted participation in the market timing scheme, "including finding and bringing several customers to engage in market timing trading, devising ways to circumvent mutual funds' prohibitions against market timing, and opening or directing the opening of multiple mirror accounts with deceptive account representative and branch identification codes, constitutes egregious conduct." *Id.* at 10–11. Second, "Murray's intent to deceive the mutual funds is clear and undisputed." *Id.* at 11 (quoting *Ehrenkrantz King Nussbaum*, 2012 WL 893917, at *13). Third, "Murray's conduct did create at least the risk of substantial losses to others." *Id.* Fourth, Defendant's conduct was not isolated. *Id.* at 12 ("Murray worked on multiple fronts throughout 2002 into early 2004 to execute the market timing scheme against numerous mutual funds.").

7

Magistrate Judge Brown noted, however, that Defendant's current financial situation weighs against the imposition of a civil penalty. *Id.* Defendant claims that he is "totally disabled" and that his monthly income is $1,800 in disability benefits and $1,300 in survivor benefits, which he receives on behalf of his son as a result of the death of his son's mother. (Docket No. 85, Def. Opp'n Damages ¶ 7.) Although Magistrate Judge Brown noted that Defendant's financial situation was compelling, he concluded that "Murray's largely undisputed claim of poverty cannot defeat the imposition of a civil penalty, as imposing no penalty 'would not serve the purposes of the securities law.'" (Report & Recommendation 12 (quoting *SEC v. Inorganic Recycling Corp.*, No. 99 Civ. 10159, 2002 WL 1968341, at *4 (S.D.N.Y. Aug. 23, 2002))). Weighing both Defendant's financial situation and his egregious conduct, Magistrate Judge Brown recommended a civil penalty of $90,183. *Id.* at 12–13.

Defendant objects to the imposition of a civil penalty equal to the disgorgement, arguing that "assessing a penalty equal to the amount paid to White Star is . . . flawed and unjust. (Def. Obj. 5.) Defendant also argues that "there is absolutely no proof to show that anyone suffered any loss, dilution of share value, excessive expense charges or any harm" by Defendant. *Id.* at 8. In other words, Defendant objects to Magistrate Judge Brown's conclusion with regard to the third factor that his conduct created a risk of substantial losses to others, as well as Magistrate Judge Brown's ultimate conclusion that civil penalties should be imposed equal to the profits Defendant received through the scheme. For the following reasons, the Court agrees with Magistrate Judge Brown's recommendation and finds that civil penalties should be imposed in the amount of $90,183.

Judge Hurley found that Defendant had committed four violations of the securities laws. *Ehrenkrantz King Nussbaum*, 2012 WL 893917, at *16. Each violation involved fraud or deceit

and, therefore, the statutory maximum penalty against Defendant is $240,000. *See* 15 U.S.C § 77t(d)(2); 17 C.F.R. § 201.1002. The determination of the appropriate penalty is within the discretion of this Court. *Kern*, 425 F.3d at 153. This Court agrees with Magistrate Judge Brown that the first four factors way in favor of the imposition of a significant civil penalty. As set forth in Judge Hurley's 2012 decision and the Report & Recommendation, Defendant's multifaceted and continuous participation in the marketing scheme was egregious, and his intent to deceive the mutual funds is undisputed. (Report & Recommendation 11–12 (citing *Ehrenkrantz King Nussbaum*, 2012 WL 893917, at *13)). With respect to the third factor, Defendant argues that Plaintiff has failed to establish that the mutual funds experienced any harm as a result of the market timing scheme. (Def. Obj. 8.) Defendant is correct that Plaintiff did not present any evidence in support of its motion for damages "to show that anyone suffered any loss, dilution of share value, excessive expense charges or any harm by the Plaintiff." *Id.* In fact, Plaintiff fails to even address this factor in its motion. Still, the undisputed facts demonstrate that Defendant's conduct created a risk of substantial losses to others.

In Judge Hurley's 2012 decision, he detailed not only Defendant's involvement in the market timing scheme but also the actions that the mutual fund families had taken during the relevant time period to detect and prevent market timing activity. *See Ehrenkrantz King Nussbaum*, 2012 WL 893917, at *3–8. In 2002 and 2003, various mutual funds issued statements indicating that frequent trading might be disruptive to the funds and, therefore, market timing was "frowned upon." *Id.* at *3. Several mutual fund families then limited the exchanges a customer could make to ten exchanges per account. *Id.* As Judge Hurley noted, the mutual fund families promulgated this policy in an attempt to "prevent market timing and its attendant negative potential impact on shareholders, including higher administrative costs and lower

returns." *Id.* Moreover, Judge Hurley noted that the mutual fund families dedicated a "number of employees to the task of reviewing accounts and trading information in order to detect market timing activity." *Id.* Defendant engaged in a scheme to open mirror accounts, which were created to avoid detection so that his clients could engage in market timing activity. *Id.* at *6–7.

The mutual fund families determined that shareholders could be harmed as a result of market timing, and, "if the mutual funds had detected the market timing activity carried out by Murray's clients via their mirror accounts, they would have stopped it." *Id.* at *7, 11. Accordingly, the Court agrees with Magistrate Judge Brown that Defendant's conduct "create[d] at least the risk of substantial losses to others," (Report & Recommendation 11), which weighs in favor of the imposition of civil penalties. *See E. Delta Res. Corp.*, 2012 WL 3903478, at *9 ("Although plaintiff does not attempt to quantify the amount of loss to others, defendants' activities had the effect of raising East Delta's share price for the investing public. Thus, the Court finds that defendants' conduct, at minimum, directly or indirectly . . . created a significant risk of substantial losses to other persons." (alteration in original) (citation and internal quotation marks omitted)). Finally, Defendant is disabled and has limited monthly income; therefore, his current financial condition weighs in favor of a reduction of the civil penalty imposed. (Docket No. 85, Def. Opp'n Damages ¶ 7.) Nevertheless, "claims of poverty cannot defeat the imposition of a disgorgement order or civil penalty." *Inorganic Recycling Corp.*, 2002 WL 1968341, at *4; *see also Opulentica*, 479 F. Supp. 2d at 331–32 ("Disgorgement alone is an insufficient remedy, since there is little deterrent in a rule that allows a violator to keep the profits if [he] is not detected, and requires only a return of ill-gotten gains if [he] is caught." (citation omitted)).

Considering the relevant factors, including Defendant's current financial situation, the Court finds that a civil penalty should be imposed but the penalty should be below the maximum penalty available. Magistrate Judge Brown recommended the imposition of sanctions equal to Defendant's ill-gotten gains. (Report & Recommendation 12–13.) Although Defendant argues that the imposition of a civil penalty equal to the disgorgement amount is not just, (Def. Obj. 5), courts have recognized that "the amount of the regulatory penalty assessed should have some relationship to the amount of ill-gotten gains," *One Wall St.*, 2008 WL 5082294, at *9 (collecting cases). Recognizing the punitive aspect of civil penalties, Magistrate Judge Brown recommended a civil penalty equal to the disgorged profit. (Report & Recommendation 12–13.) Such a penalty recognizes the need to "deter and punish" Defendant's securities law violations, while recognizing that a statutory maximum penalty is not appropriate in this case. *See SEC v. Kapur*, No. 11 Civ. 8094, 2012 WL 5964389, at *7 (S.D.N.Y. Nov. 29, 2012); *see also One Wall St.*, 2008 WL 5082294, at *9 (imposing a civil penalty "equal to the amount of [the defendant's] ill-gotten gains"). Accordingly, the Court imposes a civil penalty in the amount of $90,183.

## II. Conclusion

Having considered Magistrate Judge Brown's Report & Recommendation and the accompanying objections, the Court adopts the Report & Recommendation in its entirety. The Court orders that Defendant is permanently enjoined from future violations of Section 17(a)(1) of the Securities Act of 1933, Section 10(b) of the Securities Exchange Act of 1094 and Rule 10b-5 thereunder and Section 15(c)(1) of the Exchange Act. The Court further orders

disgorgement in the amount of $90,183 and civil penalties in the amount of $90,183 against Defendant. The Clerk of Court is directed to enter judgment and close this case.

SO ORDERED:

/S/ Judge Margo K. Brodie
_____
MARGO K. BRODIE
United States District Judge

Dated: March 6, 2013
Brooklyn, New York